UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

Eastern District of Kentucky
**FILED**

**JUN 0 1 2005**

AT LEXINGTON
LESLIE G WHITMER
**CLERK** U S DISTRICT COURT

CIVIL ACTION NO. 04-21-KSF

ELITE AESTHETIC SOLUTION, INC., *et al.*                    PLAINTIFFS

V.                              **OPINION & ORDER**

STANDARD CAPITAL CORPORATION, *et al.*                    DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on the motion of defendant Lumenis, Inc. ("Lumenis"),
for summary judgment [DE #18], the motion of defendant Standard Capital Corporation ("SCC")
for summary judgment [DE #19], the plaintiffs' motion for leave to amend complaint [DE #21],
and the plaintiffs' cross-motion for summary judgment [DE #23; DE #25].

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

While the facts are largely undisputed, there is some confusion in the record regarding
the exact timing of many key events. In an attempt to straighten this out, and to facilitate
analysis of the plaintiff's fraud claim, the facts are outlined below in some detail.

Sometime in early 2002, James Kearney ("Kearney"), the now son-in-law of plaintiff
Andrew Hamon, M.D. ("Hamon"), began investigating the possibility of opening a laser hair-
removal business that they would ultimately call Elite Aesthetic Solutions ("EAS"). Based on
Kearney's research, they decided to pursue the purchase of a laser hair removal system that used
"Intense Pulsed Light" technology, a technology that Kearney's then-fiancee (Hamon's
daughter) was already trained to use. In connection therewith, Kearney contacted Lumenis to
inquire about purchasing its "Epilight" system, and was connected with Lumenis sales

representative Lee Pannell ("Pannell"). Pannell indicated that the Epilight was no longer manufactured by Lumenis and suggested that a new system called "Vasculight" might meet Kearney's needs, and set up an initial fact-finding meeting.

According to Kearney's deposition, at some point in mid- to late-March of 2002, Kearney and Hamon met with Pannell at the Steak 'N' Shake restaurant in Lexington to find out more about Lumenis's Vasculight system (the "First Meeting"). Kearney and Hamon testified that Pannell did not provide them with any written materials on the Vasculight system and that the parties did not at all discuss the subject of the Vasculight's cost at this First Meeting. Rather, it was more in the nature of a fact-gathering meeting for Pannell.

According to the plaintiffs, prior to any further face-to-face meeting, Pannell provided Hamon and Kearney with a sample purchase order ("PO") for a Vasculight system dated March 15, 2002. It specified a price of $139,900 for a unit with a standard one-year warranty, plus freight of $1,800, for a total price of $141,700, and stated that the quoted price was good through March 29, 2002 (PO # 24829). This was apparently a PO that Pannell had prepared for another purchase and that he used as an example to show the plaintiffs what the equipment would cost. Thus, it appears that the parties began to consider pricing at some point around the time of the First Meeting.

On April 8, 2002, Pannell sent an e-mail message to Jeff Lalima at SCC, which stated the following:

> Jeff,
>
> Please start the credit check on this one [referring to Hamon]. (Dr. Hamon is the partner of James Kearney.) This is for a VascuLight SR plus extended warranty at $139,900.
>
> I will be with Dr. Hamon and James Kearney on Wednesday morning, and I will I [sic] need lease documents at that time. I think he is going for the "2002

-2-

program", but he may go for a straight lease. So, we can have multiple
documents ready (like we did with Dr. Hebert).

Apparently in response to Pannell's e-mail, SCC prepared a package for Hamon containing two

lease proposals for his consideration (hereinafter collectively referred to as the "SCC Lease

Proposal Documents"):

(1)     A cover letter from SCC to Hamon dated April 9, 2002, with a handwritten
        notation of "2002 program" on it. The cover letter indicated that the package also
        contained a lease contract, equipment list, end of lease purchase option, delivery
        and acceptance certificate, insurance certification, and invoice for an advance
        payment of $2,421.12 (as calculated below).

        Lease Contract: The lease contract contained the following relevant terms:
        •       A schedule of rent payments during the lease.
        •       Total number of months was 60.
        •       The first monthly payment of $2,002.00 plus tax.
        •       Then, 11 monthly payments of $200.20 plus tax each.
        •       Then, 48 monthly payments of $3,691.83 plus tax each.
        •       A notation to the side of this schedule stated that "[t]he appropriate sales,
                use and/or rental tax(es) will be added to your monthly base rent."
        •       The lease contract also contained a section setting forth the terms of the
                required "INDIVIDUAL PERSONAL GUARANTY" and a place
                thereunder for Hamon to sign, with the following notation: "Signature
                (individually; no corp. titles)."

        Invoice: The attached invoice required an initial payment of $2,421.12,
        consisting of the first month's rent of $2,002.00 plus 6% Kentucky sales tax of
        $120.12 plus certain one-time financing fees (credit check, etc.) of $299.00.

(2)     An almost-identical cover letter from SCC to Hamon, with the following
        differences: (1) the handwritten notation read "60 month straight lease" and (2)
        the Advance Payment Amount was for $3,312.05.

        Lease Contract: The lease contract contained the following relevant terms:
        •       A schedule of rent payments during the lease.
        •       Total number of months was 60.
        •       60 monthly payments of $2,842.50 plus tax each (no interest rate was
                specified).
        •       A notation to the side of this schedule stated that "[t]he appropriate sales,
                use and/or rental tax(es) will be added to your monthly base rent."
        •       The lease contract also contained a section setting forth the terms of the

-3-

required "INDIVIDUAL PERSONAL GUARANTY" and a place
thereunder for Hamon to sign, with the following notation: "Signature
(individually; no corp. titles)."

Invoice:  The attached invoice required an initial payment of $3,312.50 consisting
of the first month's rent of $2,842.50 plus 6% Kentucky sales tax of $170.55 plus
certain one-time financing fees (credit check, etc.) of $299.00.

(This second proposal is hereinafter referred to as the "SCC 60-Month Straight Lease Proposal.")

The cover letters do not indicate whether SCC mailed and/or faxed the SCC Lease Proposal

Documents to Hamon, but each was dated April 9, 2002.  There is nothing in the record to

indicate when Hamon and/or Kearney received these proposals or whether they received the

SCC Lease Proposal Documents prior to any subsequent meeting with Pannell.

Kearney and Hamon met with Pannell again on or about April 10, 2002, this time at

Hamon's home (the "Second Meeting").  This was a much more extensive meeting, where cost

and financing options were discussed in detail.  Pannell provided Kearney and Hamon with

several marketing materials, including a one-page flier which described special promotional

lease arrangements for the Vasculight system, as well as pricing for both a new system and a

demo unit with either a 1-year factory warranty or an extended five-year warranty (hereinafter

the "Flier").[1]  According to the plaintiffs, Pannell presented all leasing proposals as if Lumenis

was providing the financing, with no mention of SCC.  In fact, Lumenis would sell the

Vasculight to SCC, which would then lease the equipment to the customer.  At this Second

Meeting, Pannell also told Kearney and Hamon that they could save a significant amount of

---

[1]     There is some suggestion in the record that Pannell provided the Flier to Hamon
and/or Kearney prior to this Second Meeting.  However, for purposes of this motion, the Court
has taken the facts as suggested by the plaintiffs, which is that they first saw the Flier at the
Second Meeting.

-4-

money (approximately $44,000) by leasing a demo unit instead of a new unit.

It is significant that the Flier outlined special promotional lease arrangements for the *first quarter of 2002*, which was either already over or nearing its end by the time the parties had their First and Second Meetings. The Flier stated that "All systems must be shipped by 3/22/02 . . . .", a date which had either passed or was fast approaching. Specifically, the Flier outlined three separate financing options: (1) a special program described as "$2002 down, $200/month for 11 months, then normal 60-month lease" (the "2002 Program Option"); (2) a "3.9% interest rate for 60-month lease" (the "3.9% Straight Lease Option"); and (3) a "5.9% [interest rate] with $0 for 3 months, $99 for 3 months, then normal 60-month lease." According to Kearney and Hamon, because the 2002 Program Option had expired or was ready to expire, Pannell assured them that he would extend *that offer* to the plaintiffs.

At the Second Meeting, Pannell also gave Kearney and Hamon a "Return on Investment Analysis Worksheet" which outlined what they could expect to earn with the Vasculight, based on Lumenis's conservative estimate of half of the regional average income of other Vasculight users (the "ROI Worksheet"). The ROI Worksheet indicated that a Vasculight user could expect gross revenues per month of $11,675 and a net monthly revenue of $5,738 after subtracting out an approximate "monthly investment for lease of systems" of $2,937 and approximate monthly overhead of $3,000. According to a handwritten notation on the ROI Worksheet, the "investment for lease of systems" figure was based on a standard 8% interest rate 60-month lease. The following statement was at the bottom of the ROI Worksheet: "This analysis is based upon information provided by the customer and does not represent recommendations of Lumenis, Inc."

-5-

The plaintiffs assert that Pannell also provided Kearney and Hamon with two sets of lease agreements at the Second Meeting. The plaintiffs do not expressly identify which documents Pannell gave them, but refer to the SCC Lease Proposal Documents described in detail above. Therefore, for purposes of this analysis, the Court assumes that this is the first time Hamon and Kearney saw the SCC Lease Proposal Documents, and that the lease proposals Pannell gave to them at the Second Meeting are identical to the SCC Lease Proposal Documents mailed or faxed by SCC on April 9th. Thus, according to the plaintiffs' version of events, Hamon and Kearney received the Flier and the SCC Lease Proposal Documents at the same meeting, but the SCC Lease Proposal Documents did not reflect the lease options as presented in the Flier (specifically, there were no lease proposal documents representing the 3.9% Straight Lease Option). In fact, neither of the straight lease options in the Flier were the same as the terms offered in the SCC 60-Month Straight Lease Proposal. Instead, the interest rate in the SCC 60-Month Straight Lease Proposal was actually over 9%.

At some point after the Second Meeting, Pannell also provided two additional purchase orders to Hamon and Kearney for their consideration. One was dated April 15, 2002, and set forth the following terms:

•Vasculight SR system (not specified as a new or demo unit) for $139,900
•4-year extended warranty for $39,600
•"Skinscape system" (not specified as a new or demo unit) for $14,500
•Freight charge of $2,100
•**TOTAL PACKAGE COST OF $196,100.**
•Quote was good until April 30, 2002

This PO was signed by a Lumenis representative and identified as "Agreement Number AP 25528." This was apparently a PO reflecting the cost of new systems. A second PO was also provided to Hamon and Kearney, also dated April 15, 2002, with the following terms:

-6-

•Vasculight SR system (specified as a demo unit) for $139,900
•4-year extended warranty for $39,600
•"Skinscape system" (specified as a demo unit) for $14,500
•Freight charge of $2,100
• "Special Customer Discount" of $56,200
•**TOTAL PACKAGE COST OF $139,900**
•Quote was good until April 24, 2002

The "Special Customer Discount" provision contained the following additional terms:

1. A.S.A.P.S. special bundled pricing
2. Additional discount on demo systems (Please note:  demo systems are available on a "first come" basis.)
3. Customer financing must be completed by April 24, 2002.
4. Customer agrees to take shipment of system by June 3, 2002.

This PO, also signed by a Lumenis representative and also identified as "Agreement Number AP

25528," apparently represented pricing for demo systems.[2]  (This is referred to hereafter as the

"Demo PO.")

At some point after the Second Meeting, Hamon approached Central Bank to see what

kind of financing terms it could offer.  For comparison purposes, Hamon showed Central Bank

the 3.9% Straight Lease Option on the Flier and Central Bank responded that it would charge

him significantly more than that (closer to 6%).  Hamon did not take the SCC 60-Month Straight

Lease Proposal to the bank or consult anyone else about the SCC Lease Proposal Documents.  In

fact, Hamon admits that he never read any of these documents.

Meanwhile, Pannell was apparently encouraging Hamon (who would likely say Pannell

was "pressuring" him) to purchase the Vasculight demo system being exhibited at a plastic

---

[2]     The Court notes that, in their brief, the plaintiffs state that this second PO "offered additional equipment, 4 additional years of warranty and a claimed $56,200.00 savings."  This is incorrect based on the exhibits provided with the plaintiffs' brief.  As far as the Court can discern, the quotes were essentially identical, except that the first one was for new systems and the second one was for demo systems.

surgery meeting at a convention center. To that end, on Sunday, April 21, 2002, Pannell sent

Hamon a letter encouraging him to take the demo deal offered in the Demo PO Hamon had

previously received. This letter also included another copy of the Demo PO, which was only

good until April 24, 2002, and another copy of the lease proposal documents outlining the "60-

month straight lease" for Hamon to sign and return. It further stated that the system could be

stored at the convention center warehouse only until June 3, 2002, suggesting that Hamon would

have to take delivery by then.

On April 23, 2002, Pannell apparently told Hamon that he needed to sign the Demo PO

by April 24, 2002, in order to avoid additional shipping charges. Hamon testified that he did not

*have* to sign any documents at that time and still could have received a demo Vasculight after

April 24, 2002, but if he waited, he would have had to pay additional shipping charges (to cover

Lumenis's cost of shipping the demo unit from the convention center warehouse to some other

facility until it was then shipped to an end-user). Also on April 23, 2002, Jeff Lalima of SCC

sent a fax to Hamon, apparently in response to a question from Hamon, advising that he could

pay off the lease without penalty at anytime after one year and that the exact calculation of the

payoff amount would depend on the date.

According to Hamon, although he never read the SCC Lease Proposal Documents or the

lease documents enclosed in Pannell's April 21, 2002, letter, it was his understanding that the

terms of the SCC 60-Month Straight Lease Proposal mirrored the terms of the 3.9% Straight

Lease Option in the Flier. Based on that belief and relying on Pannell's judgment and expertise

to get them the "best deal," Hamon signed the Demo PO on April 23, 2002.

On May 3, 2002, Pannell e-mailed Hamon asking if he had gotten his questions answered

-8-

.

regarding the lease; asking whether Pannell needed to do anything on his end; and reminding

Hamon that Pannell needed to wrap things up within a week or so to avoid storage fees on the

demo system being stored at the convention center warehouse. Hamon e-mailed back the

following:

> Lee,
>
> I did have a couple of questions. Did you find out about any agreement to buyout the equipment if something should happen to me? Also we are going to have to incorporate and as principle [sic] owner of the corporation can I purchase it through the corporation?
>
> We have to get back with the bank and our attorney the first of the week to get things moving. I will get with you the middle of the week.

Approximately one month after Hamon had signed the PO, Pannell provided Hamon with

a third copy of the SCC Lease Proposal Documents to Hamon for his consideration. According

to Hamon's deposition, immediately before signing a lease proposal, Pannell outlined for Hamon

the terms of the "2002 Program" lease documents versus the SCC 60-Month Straight Lease

Proposal, but apparently interest rates were never discussed – only the amounts of the monthly

payments, which Pannell clearly outlined. Deciding that the monthly payments under the "2002

Program" were too high, Hamon executed the 60-month straight lease, believing that the terms

would be "[s]ixty months at what we thought was 2800 and change." The plaintiffs received the

systems in June of 2002, began to use them at EAS, and apparently were still using the systems

at the time of the plaintiffs' depositions.

Hamon testified that after the transaction with Pannell and Lumenis, "something about it

did not feel right." A few months later, while attempting to find less expensive replacement

components on the internet, Kearney learned that another doctor had obtained an identical

Vasculight system within a month of EAS's purchase for almost $40,000 less than what EAS

had paid. This lawsuit followed. Specifically, the complaint contains claims for breach of contract, fraud, promissory estoppel, equitable estoppel, and breach of the implied covenant of good faith and fair dealing.

## II.    STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure allows the court to grant summary judgment "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." In considering the evidence submitted by the parties, the Court does not weigh it or determine the truth of asserted matters. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The Court is to view all facts and draw all reasonable inferences in the light most favorable to the non-moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. Tolton v. American Biodyne, Inc., 48 F.3d 937, 941 (6th Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." Copeland v. Machulis, 57 F.3d 476, 478 (6th Cir. 1995) (quoting Anderson, 477 U.S. at 252 (1986)).

Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the Court may decide the legal issue and grant summary judgment. Anderson, 477 U.S. at 249-50 (citation omitted). In most civil cases involving summary judgment, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the

-10-

[non-moving party] is entitled to a verdict." Id. at 252.  Once the moving party has satisfied its

burden of proof, the burden then shifts to the non-moving party, who may not simply rely on the

pleadings but must "produce evidence that results in a conflict of material fact to be solved by a

jury."  Cox v. Kentucky Dep't of Transp., 53 F.3d 146, 150 (6th Cir. 1995).

## III.   MOTIONS FOR SUMMARY JUDGMENT

The crux of the plaintiffs' claims is that the defendants, through Pannell, fraudulently

induced them into entering into the transaction to lease the Vasculight system.  Because all other

claims hinge on the fraud claim, the Court must address it first.

### A.   Plaintiffs' Claim for Fraud

#### 1.   The Parties' Arguments

In its motion for summary judgment, Lumenis argues that the plaintiffs' claim for

fraudulent misrepresentation must fail under the uncontested facts.  The plaintiffs' complaint

contains a number of allegations of fraud that Lumenis must address.

Lumenis first argues that there is no proof that Pannell ever misrepresented the price of

the systems, as they were all set forth with specificity and in writing on all purchase orders sent

to Hamon.  Lumenis further asserts that Pannell never misrepresented the monthly payment

terms to the plaintiffs.  Hamon received the proposed lease agreements over a month before

signing them and each clearly set out the monthly payment under the 60-month straight lease.

Any alleged statement that the plaintiffs were "getting the best deal possible" is puffing and not

actionable as fraud.  Any estimates as to what Hamon could expect to earn from the Vasculight

were opinions or predictions and not actionable as fraud.

Hamon also alleges in the complaint that he did not know that he was personally

-11-

guaranteeing the lease and that the terms of the warranty coverage were misrepresented because EAS did not receive any such information until after Hamon had signed the lease agreement. However, there is no evidence that anyone ever represented that a personal guaranty would not be required. All lease agreements clearly spelled this out and had Hamon read the documents that he had for over a month before signing them, he would have been aware of this. As to the warranty coverage, this exact information was expressly spelled out on all PO's provided to Hamon and the one he ultimately signed. Hamon cannot claim any misrepresentation.

Finally, Hamon asserts that he was defrauded into leasing the Skinscape system, which is useless to the plaintiffs. Assuming this is true, there is no damage to Hamon, since the system was thrown in for free; the PO that Hamon ultimately signed was for $139,900, a price *lower* than the price offered to Hamon in the first PO for just a Vasculight system and not including the Skinscape system.

In response and in their cross-motion on their fraud claim, the plaintiffs assert that since discovery, "the specific facts that support Plaintiffs' claims are slightly different than how they were alleged in their Complaint. At present, Hamon has a much better understanding of how he was defrauded and accordingly requests to amend (slightly) his Complaint." Thus, Hamon's amended assertion of fraud can be stated as follows. The Flier, which included the 3.9% Straight Lease Option, was an offer by Pannell to Hamon for financing on those terms. However, at the time of the offer, Pannell knew that the 3.9% Straight Lease Option was not available and could not be offered to Hamon, but Pannell offered it anyway. The Flier induced Hamon to enter into the agreements to lease the Vasculight. Hamon relied on the representations in the Flier and the handwritten note on the SCC Lease Proposal Documents (one stating "2002 Program" and the

-12-

other stating "60-month straight lease"). The proposed lease agreements provided to Hamon suggested that they were the 3.9% Straight Lease Option, but did not disclose the actual interest rate. Thus, Hamon was fraudulently induced to enter into a lease agreement with a higher interest rate (9%) than the one offered and agreed upon (3.9%). Based on the above, the plaintiffs ask the Court to enter summary judgment in their favor on their fraud claim but assert, in the alternative, that there is at least a fact question as to this claim.

In its reply, Lumenis argues that the plaintiffs now have three different factual bases for their claims. First, they claimed that Lumenis and/or SCC misrepresented the price and monthly lease payment. Second, they claim that Lumenis misrepresented to them: that they were getting the "best deal possible"; that they could expect a certain amount of profit; whether Hamon was personally guaranteeing the lease; the terms of the warranty; and whether inclusion of the Skinscape system was simply to "sweeten the deal." Now, the plaintiffs assert that the misrepresentation was of the finance rate for the lease agreement.

Lumenis argues that the plaintiffs cannot prove that it made any material misrepresentations regarding the interest rate because it was not a material term of the lease agreement. Further, the plaintiffs have not asserted that Pannell or any other party ever represented to them that the interest rate would be 3.9% or any other amount. If the plaintiffs *did* rely on the 3.9% interest rate in the Flier, this was unreasonable, as the Flier had expired by its own terms over two months before Hamon signed the lease agreement.

In their reply, the plaintiffs again assert that there is at least a fact question on their fraud claim. Pannell presented the Flier to Hamon at the First Meeting knowing that the 3.9% Straight Lease Option was not available. Pannell also represented to Hamon that "Plaintiffs were getting

-13-

the best deal and consistent with the terms on the flier." However, the information contained in the SCC Lease Proposal Documents was not consistent with the financing terms in the Flier.

### 2.    *Analysis*

Kentucky law requires the plaintiffs in the present action to establish the following elements by clear and convincing evidence to prove fraud:

> a) material representation b) which is false c) known to be false or made
> recklessly d) made with inducement to be acted upon e) acted in reliance thereon
> and f) causing injury.

United Parcel Service Co. v. Rickert, 996 S.W.2d 464, 468 (Ky. 1999) (citing Wahba v. Don Corlett Motors, Inc., 573 S.W.2d 357, 359 (Ky. Ct. App. 1978)).  As to reliance, the plaintiffs must prove that their reliance on the defendants' misrepresentations was reasonable, and in making this determination, the Court should consider the plaintiffs' knowledge and experience. Moore, Owen, Thomas & Co. v. Coffey, 992 F.2d 1439, 1447 (6th Cir. 1993); Vest v. Goode, 209 S.W.2d 833, 836 (Ky. 1948).

Of course, "[f]raud may be committed either by intentionally asserting false information or by willfully failing to disclose the truth."  Id. at 469 (citing Chamberlain v. National Life & Accident Ins. Co., 76 S.W.2d 628, 631 (Ky. 1934)).  However, in the latter case, the Kentucky Court of Appeals has noted that

> [f]raud by omission is not the same, at law, as fraud by misrepresentation, and has
> substantially different elements.  To prevail on a claim of fraud by omission, or
> fraud based on failure to disclose a material fact, a plaintiff must prove: a) that the
> defendants had a duty to disclose that fact; b) that defendants failed to disclose
> that fact; c) that the defendants' failure to disclose the material fact induced the
> plaintiff to act; and (d) that the plaintiff suffered actual damages. *Smith v.*
> *General Motors Corp.*, Ky.App., 979 S.W.2d 127 (1998).  A duty to disclose facts
> is created only where a confidential or fiduciary relationship between the parties

-14-

exists, or when a statute imposes such a duty, or when a defendant has partially
disclosed material facts to the plaintiff but created the impression of full
disclosure. *Dennis v. Thomson,* Ky., 240 Ky. 727, 43 S.W.2d 18 (1931).

Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc., 113 S.W.3d 636, 640 (Ky. Ct. App. 2003).

<u>a.</u>     3.9% Interest Rate on Straight Lease

Turning to the present case, the Court finds that the plaintiffs are unable to make out a

case of direct fraudulent misrepresentation or fraud by omission under any of the facts alleged in

their complaint, their amended complaint, or their motion for summary judgment. Their main

assertion at this point in the litigation appears to be that they were misled into signing a lease

with an interest rate higher than the 3.9% rate presented in the Flier. They assert that the Flier

fabricated by Pannell was false and misleading because it presented the 3.9% Straight Lease

Option as if it were a viable financing option for Hamon when, in fact, SCC had never

authorized this financing option and Pannell knew that this option was not available.

Assuming there was a fraudulent misrepresentation or a failure to provide full disclosure,

the plaintiffs are unable to prove reasonable reliance in the present case. The plaintiffs'

argument ignores several crucial facts, the most important of which is that the Flier expressly

stated that the special promotions contained therein were good only if the systems were shipped

by March 22, 2002. There is no dispute that this date had already passed by the time the parties

had their Second Meeting on April 10, 2002, which is when the plaintiffs claim they first saw the

Flier. There is also no dispute that the plaintiffs were aware that these special promotions had

already expired, because they specifically asked Pannell about this at the Second Meeting.

Kearney testified to the following:

Q.     So the only thing that you all talked about at this meeting [the Second

-15-

Meeting] was that you could get a demo unit and save $44,000?

A.      Well, and the two different financial plans that were available for purchasing the demo unit.

Q.      And what did he tell you about those?

A.      He gave us a brief outline of what they would be.

Q.      What did he tell you?

A.      The 2002 deal and then the straight lease.

Q.      Do you remember the details of what he told you?

A.      No, not that I recall.

Q.      So you just remember that he said there were two payment options, a straight lease or the 2002 deal?

A.      Correct, *__and that if we wanted to do the 2002 deal, it was getting ready to__* *__expire, but he would extend it for us__*.  That, I recall.

(Kearney Depo. at 34-35) (emphasis supplied).  Thus, it is clear from Kearney's testimony that the plaintiffs were aware that the 3.9% Straight Lease Option in the Flier had already expired, but that the 2002 Program Option *was* available if they wanted it.  There is no testimony, in either Kearney's or Hamon's depositions, that Pannell ever represented to the plaintiffs or suggested to them that the 3.9% Straight Lease Option was available beyond the promotional end-date of March 22, 2002.  Hamon testified that he and Pannell had a number of discussions regarding two financing options, one of which was a "60-month straight lease," but nowhere in his deposition does he suggest that Pannell represented to him that the 60-month straight lease option had an interest rate of 3.9%, other than to present the Flier to him at the Second Meeting, a Flier that Hamon knew had expired based on the terms on the face of the document.

Based on the above, it is clear that Pannell represented that he could extend only the 2002

-16-

Program Option beyond the Flier's expiration date and, therefore, it was unreasonable for Hamon to rely on the expired 3.9% Straight Lease Option. The plaintiffs have failed to adduce any evidence that Pannell ever affirmatively represented that he could extend any other of the financing options in the Flier beyond the expiration date. In an attempt to create a genuine issue of material fact, the plaintiffs argue that this distinction is "hairsplitting" and that because Pannell promised to extend a portion of the promotion, this is sufficient to establish a question of fact on the fraud claim. However, this distinction gets to the heart of the case. Hamon may have *assumed*, without ever asking or confirming, that the 3.9% Straight Lease Option would also be extended, but there is no evidence that Pannell ever made this representation or suggestion, or that any of the plaintiffs ever asked Pannell about this. As a result, Hamon may have assumed that the SCC 60-Month Straight Lease Proposal he received three copies of was for the 3.9% Straight Lease Option but, again, never asked or confirmed – in fact, he never even read the lease agreement before signing it. It is evident from the record that in his dealings with the defendants, Hamon was only concerned with keeping the monthly payment amount down, not the overall interest rate of the lease.

A number of other facts indicate that Hamon's reliance on the Flier was not reasonable. One is the fact that the defendants provided the plaintiffs with three identical copies of the SCC Lease Proposal Documents on three separate occasions – one set at the Second Meeting, a second set mailed directly from SCC, and a third set provided by Pannell – and all of these clearly set forth the monthly payment amount and the length of the lease. The defendants further provided the plaintiffs with detailed calculations in their cover letters and invited the plaintiffs to contact them if they had any specific questions. In response, the only questions Hamon had for

-17-

the defendants were (1) whether there was a buy-out provision in the event something happened to Hamon;(2) whether they could incorporate and lease the equipment through the corporation; and whether there was a penalty for paying off the lease early.  Hamon never asked about and Pannell never misrepresented the interest rate in the lease proposals.

Further, the plaintiffs had the SCC Lease Proposal Documents for over a month before they ultimately signed a lease agreement, and for almost two weeks before signing the PO (which, as Hamon testified, is the point at which he felt committed to purchasing the equipment). Hamon took time to discuss other financing options with his bank, but did not ask his banker to review the lease documents that the defendants had provided.  Hamon also apparently took the time to consult an attorney to incorporate EAS, but did not ask the attorney to review documents for this $140,000 piece of equipment.  Kearney did a good deal of computer research *before and after* Hamon signed the lease documents, but apparently did not do much research *during* lease negotiations, despite having ample time and every opportunity to do so.  Another salient fact is that Hamon was out of town much of the time between the parties' Second Meeting and the time he signed the PO on April 23, 2002.  In short, the plaintiffs could have easily and in any number of ways determined at least a ballpark figure for the interest rate[3] in the SCC Proposed Lease Documents, but they chose not to, instead proceeding with the deal so they could start their entrepreneurial venture.  The following passage from an unpublished Kentucky decision seems

---

[3]     The plaintiffs make much of the fact that an SCC representative testified that he could not calculate the precise interest rate for the SCC Lease Proposal Documents, that they were based on a "money factor" typically not disclosed to customers, etc. However, Hamon himself testified that he did some quick calculations and came up with a 4.4% interest rate as opposed to 3.9% – he could have just as easily done these "quick calculations" prior to signing the documents and asked questions then.

-18-

particularly applicable to the present case:

> By virtue of their equity powers courts have authority to reform written contracts when, because of fraud or mutual mistake, the writing does not reflect the intentions and understanding of the party seeking relief. Although parol evidence is admissible to establish such a claim, "[t]he rule is that the evidence to sustain such [judicial] interference must be clear and convincing, and the fraud and mistake must be established with reasonable certainty." The courts' goal is to respond meaningfully to genuine instances of fraud or mistake without thereby undermining the ordinary expectation that contracts will be enforced according to their plain terms. In striking this balance, Kentucky's courts have insisted that the parties to a contract exercise "at least the degree of diligence which may be fairly expected from a reasonable person." Contract reformation is not available where the complaining party negligently failed to detect the fraud or mistake. As a general rule, a literate party's failure to read a readily legible written contract amounts to such negligence and will preclude that party from later complaining that the writing did not say what she believed it did.

Gray v. First Nat'l Mtg. Co., Inc., of Evansville, 2003 WL 134370 (Ky. Ct. App. Feb. 21, 2003)

(footnotes omitted). The Court finds that the plaintiffs' failure to discover the interest rate for

the 60-month straight lease option was their own fault, and to the extent that they relied on the

expired Flier, this reliance was not reasonable.

The plaintiffs also argue that there is a question of fact as to whether Pannell made a

material misrepresentation based on the April 8, 2002, e-mail from Pannell to SCC

representative Jeff Lalima. Therein, Pannell told Lalima that he thought the plaintiffs would be

"going for" the 2002 Program Option, "but he may go for a straight lease. So, we can have

multiple documents ready (like we did with Dr. Herbert)." The plaintiffs assert that this is proof

of Pannell's fraudulent scheme, because the parties had not yet discussed financing at this point

in their negotiations. Assuming the timing of events is as the plaintiffs allege, the Court is

unable to discern any sinister motive in this e-mail; at most, it appears that Pannell was going to

push for the plaintiffs to sign a lease agreement at the Second Meeting, so he wanted to have all

documents ready and available at that meeting. Other than that, the Court cannot determine how this e-mail supports the plaintiffs' fraud claim.

Despite having had the documents for over a month before signing them, the plaintiffs also argue that they were pressured into signing the PO and then the lease. Hamon testified that he felt that the Vasculight was their only equipment option and so they either had to sign what Lumenis gave them, or they would not have a business. Even assuming that Pannell was putting pressure on the plaintiffs to lease the equipment, this is not actionable as fraud. The plaintiffs were not even in business yet. No one was forcing them to start this entrepreneurial venture. They could have taken more time to look at the documents and still have purchased the demo unit – it simply would have cost them $1,800 more in shipping. So, to save $1,800, they signed the documents. If plaintiffs felt they had a Hobson's choice, it was one of their own making.[4] Also, the plaintiffs were sophisticated professionals who had entered into similar agreements in the past. The bargaining positions of the parties were equal and the plaintiffs had sufficient means and ability to protect themselves in this transaction, but chose not to do so in order to save money on the equipment and start making money with their new business venture.

---

[4]       The Court has serious doubts as to whether the interest rate could be considered a "material" fact in this case. There are no allegations regarding the negotiations between the parties that would indicate it was the interest rate that induced the plaintiffs to sign the lease agreements – no questions about the interest rate, no additional investigation, no mention of interest rates at all, except to take the Flier to Hamon's bank. Rather, the evidence indicates that it was the monthly payment amount, the price of the equipment, and the plaintiffs' strong desire to start this business that led them to enter into the agreement with the defendants when and in the manner they did. Coffey, 992 F.2d at 1447 n.7 (noting that plaintiffs must prove that their reliance on the misrepresentation was the cause of their injury). The plaintiffs' argument that the 3.9% interest rate induced them to sign the lease seems more of an after-the-fact justification for their fraud claim and a way to extricate themselves from a deal they now consider ill-advised.

b.    Additional Allegations of Fraud

In their complaints and in their depositions, the plaintiffs make a number of other allegations of fraud, including misrepresentations as to:

> •the price of the equipment and the monthly payment terms of the lease;
>
> •whether the plaintiffs were getting the "best deal" possible;
>
> •the profits that could be expected from the Vasculight;
>
> •whether Hamon was personally guaranteeing the lease;
>
> •the terms of the extended warranty; and
>
> •whether the Skinscape system was thrown in to "sweeten the deal."

In their summary judgment motion, the defendants argue that none of these allegations are sufficient to support a fraud claim and provide supporting authority. In their response, the plaintiffs have focused on their allegation regarding the interest rate on the lease and do not address the specific allegations listed above. Where a non-movant responds, but does not raise an issue of fact regarding the issues properly supported in the motion for summary judgment, summary judgment may be granted in the movant's favor. Fed. R. Civ. P. 56(e); Guarino v. Brookfield Township Trustees, 980 F.2d 399, 404-05 & n.5 (6th Cir. 1992).

Regarding the price of the Vasculight and the monthly payment terms, whether Hamon was personally guaranteeing the lease, and the terms of the extended warranty, the plaintiffs have not offered any evidence that the defendants made any misrepresentations as to these issues or that the plaintiffs relied on any misrepresentations. The plaintiffs have also failed to show that these were "material" facts.

As to their reliance on Pannell to ensure they were getting the "best deal" possible, any

-21-

such representation is not actionable fraud in Kentucky. Rather, this is classic "puffing" and "sales talk" that does not rise to the level of fraud. McHargue v. Fayette Coal & Feed Co., 283 S.W.2d 170, 172 (Ky. 1955) (holding that " 'sales talk' or 'puffing' which is universal and an expected practice. . . . do not amount to actionable misrepresentation. This is certainly true where the parties deal at arm's length and have equal means of information."). Similarly, any prediction of future profits by Pannell is not actionable as fraud. Id. ("A mere statement of opinion or prediction may not be the basis of an action."). The allegation that the Skinscape system was thrown in to "sweeten the deal" is a bit of a mystery – the Court is unable to determine (and the plaintiffs have failed to enlighten) how this could in any way amount to fraud, particularly when it was essentially included in the deal at no cost to the plaintiffs.

**B.     Remaining Claims**

The plaintiffs' remaining claims are all dependent on whether they can prove a fraudulent misrepresentation and a showing that they reasonably relied on such misrepresentations. Because the plaintiffs have failed to meet their burden on these elements, their claims for breach of contract, promissory estoppel, equitable estoppel, and breach of the implied covenant of good faith and fair dealing also fail. This is a case about buyer's remorse, not actionable fraud.

**III.    CONCLUSION**

Based on the above, all of the plaintiffs' claims will be dismissed and judgment entered in favor of the defendants. While the Court has not specifically discussed the motion of defendant SCC for summary judgment, all of the claims against SCC flow from the alleged actions of Pannell – if his actions are not fraudulent, then the claims against SCC cannot stand. In analyzing the plaintiffs' claims, the Court also considered the plaintiffs' tendered amended

-22-

complaint, so that motion will be granted. Accordingly, the Court, being otherwise fully and

sufficiently advised, HEREBY ORDERS that

(1)     the plaintiffs' motion for leave to amend complaint [DE #21] is
        GRANTED;

(2)     the Clerk shall file the plaintiffs' tendered amended complaint in
        the record as of the date of this Order;

(3)     the motion of defendant Lumenis, Inc., for summary judgment [DE
        #18] is GRANTED;

(4)     the motion of defendant Standard Capital Corporation ("SCC") for
        summary judgment [DE #19] is GRANTED;

(5)     the plaintiffs' cross-motion for summary judgment [DE #23; DE
        #25] is DENIED;

(6)     judgment in favor of the defendants will be entered
        contemporaneously herewith;

(7)     the trial of this matter, currently set for June 14, 2005, is hereby
        SET ASIDE;

(8)     this matter is STRICKEN from the active docket of the Court; and

(9)     this is a final and appealable Order and no just cause for delay
        exists.

This _____ day of June, 2005.

KARL S. FORESTER, SENIOR JUDGE

-23-